211 P.3d 289 (2009)
229 Or. App. 160
In the Matter of F.D.J., a Minor Child.
STATE ex rel. JUVENILE DEPARTMENT OF JACKSON COUNTY, Respondent,
v.
C.D.J., Appellant.
070796J; A140644.
Court of Appeals of Oregon.
Argued and Submitted on April 22, 2009.
Decided June 17, 2009.
*290 Shannon Flowers, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.
Katherine H. Waldo, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Erika L. Hadlock, Acting Solicitor General.
Before LANDAU, Presiding Judge, and SCHUMAN, Judge, and ORTEGA, Judge.
ORTEGA, J.
Father appeals a judgment entered by the juvenile court after a permanency hearing involving his 10-month-old child. In the judgment, the juvenile court found that the Department of Human Services (DHS) had made reasonable efforts to safely return child home and that father had not made sufficient progress to make it possible for child to return home. The court ordered DHS to proceed with the plan of pursuing an adoption for child. On appeal, father challenges the court's findings, which we review de novo, ORS 419A.200(6)(b). We agree with the juvenile court that DHS made reasonable efforts for child to safely return home but, because we find that father made sufficient progress to make possible child's return home, we disagree that a change in plan to adoption was justified. We therefore reverse.
We take the following facts from the record. Child was born in December 2007. On the day after her birth, DHS took her into custody, primarily because of concerns about mother's substance abuse problems. Because child's birth certificate did not name a father, she had no legal father. However, as early as four days after child's birth, mother identified father as child's biological father.
In February 2008, when child was two months old, the juvenile court took jurisdiction over child with regard to mother. At around the same time, father was arrested on charges related to domestic violence against mother and possession of controlled substances. He ultimately was sentenced to 13 months' imprisonment on those charges and, at the time of the permanency hearing, was expected to be released in December 2008. Father was in prison through all of the proceedings in this case.
Shortly after father's arrest, a DHS caseworker personally served him with a letter informing him that he had been named as child's biological father and requiring him to respond within 14 days. Five months passed before father responded to the DHS letter. In July, three months before the permanency hearing, father signed and submitted an affidavit voluntarily acknowledging paternity. However, the Division of Child Support (DCS) rejected the affidavit because its records showed that mother was married, apparently to someone other than father. As a result, in September, DHS asked father to submit to paternity testing.
At the same time, DHS filed an amended petition, asserting jurisdiction over father. At the mid-October jurisdictional hearing, father admitted that his substance abuse and his perpetration of domestic violence against mother endangered child's welfare; the juvenile court assumed jurisdiction on those bases. At child's attorney's request, an accelerated permanency hearing occurred one week *291 laterapproximately eight months after jurisdiction over child was first established.[1]
Although he was eventually determined to be child's biological father, at the time of the permanency hearing, father's paternity had not yet been established conclusively, and DHS had not offered father any services. Although the agency had sent father a letter of expectation in August, that letter is not in the record and its contents are not otherwise described in the case plans. However, during his incarceration, father participated in Civigenics, a prison drug and alcohol treatment program that also focuses on anger management and cognitive restructuring. Although father expected to complete the program before his prison term ended, there was no evidence regarding father's progress. Because of the limited duration of his sentence, father was not eligible for domestic violence-related programs.
At the permanency hearing, father contended that the permanency plan should continue to be "reunification with parent." He pointed out that the court had only recently established jurisdiction over him, that child had been in foster care for less than one year, that he had been participating in services that were available to him in prison, and that he would soon be released from prison. Father acknowledged that he had not participated in any programs designed to address domestic violence but noted that, due to his short prison sentence, he was not eligible for those programs. As noted, the court ultimately found that DHS had made reasonable efforts to reunify child with father and that father had not made sufficient progress to make it possible for child to safely return home. As a result, the court changed the permanent plan to adoption and entered judgment accordingly.
Father appeals. Relying primarily on State ex rel. Juv. Dept. v. Williams, 204 Or.App. 496, 130 P.3d 801 (2006), he contends that, in light of DHS's failure to provide him with any services during his incarceration, the agency did not make reasonable efforts to reunify him with child. Although father acknowledges that DHS contacted his prison counselor on several occasions to learn about the programs that father was participating in, he contends that those actions were minimal, not reasonable, efforts. DHS responds that, in light of father's prior failure to accept services and his five-month failure to acknowledge paternity, its actions constituted reasonable efforts to return child home to father.[2]
ORS 419B.476, which governs the conduct of permanency plan hearings, provides that a court may order a change in plan to adoption but, in doing so, must determine whether one of the circumstances in ORS 419B.476(2) is applicable. ORS 419B.476(5)(b), (d). ORS 419B.476(2) provides, in part:
"At a permanency hearing the court shall:
"(a) If the case plan at the time of the hearing is to reunify the family, determine whether [DHS] has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."
Thus, to obtain a change in the permanency plan from return to parent to adoption, DHS must prove that, despite its reasonable efforts to effect reunification, the parents did not make sufficient progress to allow the child's safe return to the home. State ex rel Dept. of Human Services v. Shugars, 208 Or.App. 694, 711, 145 P.3d 354 (2006). "`The type and sufficiency of efforts that the state *292 is required to make and whether the types of actions it requires parents to make are reasonable depends on the particular circumstances.'" Williams, 204 Or.App. at 506, 130 P.3d 801 (quoting State ex rel SOSCF v. Frazier, 152 Or.App. 568, 582, 955 P.2d 272, rev. den., 327 Or. 305, 966 P.2d 220 (1998)).
Although the parties' arguments primarily focus on whether DHS made reasonable efforts in light of father's incarceration, in our view, the uncertainty surrounding father's legal relationship with child is especially significant. Accordingly, that circumstance plays an important role in our analysis.
Under Oregon law, DHS's obligation to provide services and a juvenile court's authority over a parent hinges on the parent's legal relationship to the child at issue. Except in limited circumstances not applicable here, it "is the policy of the State of Oregon * * * to offer appropriate reunification services to parents and guardians" when a child is taken into custody and a dependency petition has been filed. ORS 419B.090(5). Pursuant to that policy, DHS must make "reasonable efforts" to make possible a child's safe return home. ORS 419B.340(1); ORS 419B.476(2)(a). Once a dependency petition has been filed and the juvenile court has assumed jurisdiction over the child, the court may also assume jurisdiction over the child's "parent" and require the parent to participate in services. ORS 419B.385; ORS 419B.387. As used in the juvenile code, the term "parent" refers to the child's "biological or adoptive mother" and "legal father," meaning a man who has adopted the child or whose paternity has been legally established. ORS 419A.004(16). Under DHS's own rules, a "parent" includes a "putative father who has demonstrated a direct and significant commitment to the child by assuming or attempting to assume responsibilities normally associated with parenthood." OAR XXX-XXX-XXXX(11) (March 20, 2007). Accordingly, DHS has no obligation to offer services to a putative legal father who has not attempted to assume any of the responsibilities of parenthood.
The record here reveals that, for most of the duration of the case, DHS's primary concern was establishing father's legal relationship to child. Under those circumstances, where DHS was confronted with a putative legal father and an accelerated permanency hearing, we conclude that DHS's efforts to establish father's paternity constituted reasonable efforts to make possible child's safe return home to father. Eight months before the permanency hearing, DHS personally notified father that mother had identified him as child's biological father and asked him to acknowledge or deny paternity. Despite DHS's request that he do so within 14 days, father waited five months before acknowledging paternity. After he did so, DHS began efforts to work with father, sending him a letter of expectation and filing a dependency petition for child with regard to father. After DCS rejected father's paternity affidavit, DHS sought a paternity test in order to conclusively establish father's paternity. Because those steps were necessary predicates to providing services to father that would be required to accomplish child's return home to his care, we conclude that DHS made reasonable efforts to make possible child's return home.
However, we also conclude that father made sufficient progress to allow child to return home. DHS's requests, by their nature, required nothing more than father's cooperation. Although father took five months to acknowledge paternity, he ultimately both acknowledged paternity and submitted to DHS's request for a paternity test. As far as the record reveals, DHS's requests required father to do little more. Given the minimal nature of DHS's requests and the accelerated pace of the permanency hearing, father's acknowledgement of paternity and his cooperation in paternity testing constituted sufficient progress toward reunification under the circumstances. Cf. State ex rel Juv. Dept. v. K. D., 228 Or.App. 506, 514, 209 P.3d 810 (2009) (noting that, when considering a parent's efforts, this court considers whether the parent has ignored or refused to participate in the plans required by the state).
Reversed.
NOTES
[1] Generally, a juvenile court must conduct a permanency hearing within 12 months after a child is found within the court's jurisdiction or within 14 months after the child is placed in substitute care. ORS 419B.470(2). However, a child's attorney can request an earlier permanency hearing and, unless good cause is otherwise shown, the court must schedule a hearing as soon as possible after receiving that request. ORS 419B.470(5).
[2] In a previous dependency proceeding involving child's brother, DHS offered services, including domestic violence and drug abuse treatment, to father, but he never engaged in those services.