230 P.3d 965 (2010)
235 Or. App. 307
In the Matter of E.C., a Child.
DEPARTMENT OF HUMAN SERVICES, Petitioner-Respondent,
v.
B.J.W., Appellant.
07409J; A143593.
Court of Appeals of Oregon.
Argued and Submitted March 10, 2010.
Decided May 12, 2010.
*966 James J. Spindor, Klamath Falls, argued the cause and filed the brief for appellant.
Harry B. Wilson, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.
Before SCHUMAN, Presiding Judge, and WOLLHEIM, Judge, and ROSENBLUM, Judge.
SCHUMAN, P.J.
Father appeals from a judgment that authorized the Department of Human Services (DHS) to change its plan for his child, E., from reunification to adoption. He argues that the trial court erred by admitting certain hearsay evidence that did not fall within the exception for evidence "relating to the ward's mental, physical and social history and prognosis[.]" ORS 419B.325(2).[1] He also argues that, without the allegedly inadmissible evidence, the state did not establish that the permanency plan should be changed. We affirm.
Father argues that we should exercise de novo review. ORS 19.415(3)(b); see also Or. Laws 2009, ch. 231, §§ 2, 3 (establishing the effective date for the change in the standard of review). However, this case does not involve disputed facts. The only issues on appeal are whether the court committed legal error by admitting certain exhibits and whether, purged of those exhibits, the evidence supports the court's disposition. Those are both purely legal issues. Our standard of review, therefore, is for errors of law. State ex rel. Juv. Dept. v. G.L., 220 Or.App. 216, 218, 185 P.3d 483, rev. den., 345 Or. 158, 190 P.3d 379 (2008).
Father has one child, E. At the time of the hearing, E. was three years old and living in foster care. Father and mother ended their relationship shortly after E. was born, and mother is not a party to this appeal. DHS filed a dependency petition in July 2007. In the petition, DHS alleged that E. was within the juvenile court's jurisdiction because of mother's and father's history of engaging in domestic violence, father's use of alcohol and controlled substances, his chronic instability, chaotic lifestyle, and involvement in criminal activities, all of which endangered the welfare of E. Based on the state's evidence in support of these allegations, the court took jurisdiction of E. and ordered that father:
"1) Participate in and successfully complete a drug and alcohol evaluation with a DHS/CWP approved provider, follow any and all recommendations and demonstrate a drug-free lifestyle.
"2) Sign all necessary releases of information.
"3) Submit to urinalysis as requested by DHS/CWP and/or any treatment provider.
"4) Participate in and successfully complete domestic violence counseling with a DHS/CWP approved provider and demonstrate a violence-free lifestyle.
"5) Participate in and successfully complete a comprehensive psychological evaluation, if requested, with a DHS/CWP approved provider and follow services recommended from the evaluation.
"6) Participate in and successfully complete a DHS/CWP approved parent training program and demonstrate skills learned in the program."
Father was sent to prison shortly after the juvenile court's order. In October 2008, the juvenile court continued the petition, renewed the order set out above, and further ordered father, when he was released from prison, to maintain safe and stable housing and meet all his parole requirements. After *967 his release from prison in late December 2008, father engaged in services with DHS, but soon dropped out and stopped visitations with E.
In August 2009, DHS requested that the juvenile court change E.'s permanency plan from reunification to adoption. Mother did not contest DHS's request. During the permanency hearing, the trial court admitted numerous reports regarding father's criminal, psychological, and substance abuse history. Most of those reports stated that father has a personality disorder, significant authority problems and general antisocial personality traits, difficulty managing his anger, recurring substance abuse problems, and a general unawareness that he has any of these problems. Father objected to the admission of some of the reports, arguing that, although ORS 419B.325(2) allows hearsay evidence "relating to the ward's mental, physical and social history and prognosis," the disputed reports related only to father and not to child. The trial court disagreed, admitted the reports, and allowed the change of the permanency plan to adoption.
On appeal, father renews his objection to the admission of certain exhibits and argues that the record, purged of that evidence, does not establish by a preponderance of the evidence that the change in plan is in the child's best interest. The dispute requires us, as an initial matter, to construe ORS 419B.325(2):
"For the purpose of determining proper disposition of the ward, testimony, reports or other material relating to the ward's mental, physical and social history and prognosis may be received by the court without regard to their competency or relevancy under the rules of evidence."
(Emphasis added.) The disputed evidence in this case consists entirely of "reports or other material," and it focuses primarily on father's mental, physical and social history and prognosis. Some of the reports focus entirely on father; one, for example, is a collection of documents involving father's arrest, plea, conviction, and sentence for criminal mischief in 1997, over two years before E. was born. The state contends that father's history and character have an obvious, if indirect, bearing on the degree to which child might or might not be harmed by reunification, and therefore to child's "prognosis." Father maintains that the statute applies only to material that deals directly with E. We conclude that an all-purpose bright line rule defining what "relating to the ward's * * * prognosis" means is not necessary in the present case.
Some preliminary observations based on the text of ORS 419B.325(2) are in order. State v. Gaines, 346 Or. 160, 172, 206 P.3d 1042 (2009). First, the statute refers to "report[s] or other material[s]"; it does not refer to portions or particular statements in reports or other materials. We therefore reject, for most purposes, the suggestion that the court must parse materials in order to redact information in them that does not relate to the ward.
Second, for "the purposes of determining proper disposition of the ward" we note that the term "prognosis" in ORS 419B.325(2) is problematic. In one sense, the term presupposes a pathological medical or psychological condition and refers to its course into the future: "the prospect of survival and recovery from a disease as anticipated from the usual course of that disease or indicated by special features of the case in question." Webster's Third New Int'l Dictionary 1812 (unabridged ed. 2002) (emphasis added). In another sense, however, it refers more generally to any prediction: "FORECAST, PROGNOSTICATION." Id. In the context of ORS 419B.325(2), only the second meaning makes sense. That is so for two reasons. First, the word is paired with "history," which is retrospective and nonmedical, and we have no reason to believe that the legislature would authorize the admission of relevant past facts in general, but relevant facts regarding the future only insofar as they deal with medical or psychological pathology. Second, "prognosis" is modified not only by "mental" and "physical," but by "social" as well, and although it makes perfect sense to speak of a cultural, national or other collective social pathology, the idea of an individual's social pathology makes little sense.
Further, a person's prognosis or forecast, although grounded in facts in existence at *968 the time it is rendered, also takes into account future contingencies. In the medical context, whether a particular patient's prognosis is negative or positive can depend on whether the patient follows a particular course of treatment, takes particular precautions, or adopts particular habits. Information about those future contingencies, in other words, "relates to" the prognosis. Likewise, a prognosis or general forecast regarding a ward's physical, mental, or social condition depends to some extent on the environment in which the ward is placed. Thus, information about that environment including possible caretakers"relates to" the ward's prognosis.
In sum, we conclude that evidence relates to a ward's "mental, physical and social * * * prognosis" if it provides information that is relevant to a forecast or prediction of how the ward will fare in the future, and it necessarily includes information about the ward's future potential caregivers. We therefore reject father's contention that ORS 419B.325(2) encompasses material only if its direct and exclusive subject is the ward.
That rejection, however, does not necessarily mean that ORS 419B.325(2) allows the court to receive any and all evidence that has a relationship, no matter how tenuous, with any of the ward's past, present, or potential future caregivers. In this case, however, we need not define a precise line between admissible and inadmissible. Material that deals expressly with E.'s history is admissible. Additionally, the statute allows the admission of material in reports that either the court or DHS ordered for the purpose of evaluating whether, or to what extent, father can maintain his relationship with E. Of the 11 exhibits to which father objects, eight fall within one or another of those categories. The remaining exhibits, some of which are of dubious relevance to E. or her prognosis, provide no information that was not properly before the court in either the contested but clearly admissible exhibits as described above, or exhibits to which father did not object. Thus, if admitting any or all of the more dubious exhibits was error, it was harmless. We therefore reject father's first assignment of error.
In his second assignment of error, father maintains that, in presenting the properly admitted evidence, the state did not meet its burden of proving that the plan for E. should be changed from "return to parent" to adoption. Perhaps because we disagree with father about what evidence was admissible, we also disagree about what the admissible evidence establishes. The admissible and undisputed evidence in the record discloses that father and mother began their relationship when mother was 15 and father was in his mid-twenties. Both parents had substance abuse problems throughout their relationship. Father harassed and physically abused mother before and after their relationship ended, and the court placed a no-contact order between them, which both mother and father violated. Father has criminal convictions dating back to 1996 for a variety of crimes including assault, menacing, intimidation, criminal mischief, failure to appear, and felon in possession of a firearm. He was incarcerated repeatedly, most recently from October 2007 until December 2008, or more than one third of E.'s lifetime. In addition, father has a history of substance abuse stretching back to his early teens; he reported using alcohol, marijuana, methamphetamine, Vicodin, and hallucinogenic mushrooms, and has been convicted of possession of marijuana (1996) and methamphetamine (1998, 2005, and 2008after the birth of E.). At one point, he was intoxicated at a party, with E. in attendance; two days later, he was intoxicated again while E. was under his care. A witness also reported to DHS that she saw him smoke marijuana from a marijuana pipe and then hand the pipe to E. In short, we conclude that the court did not err in determining that the state proved by a preponderance of evidence that changing E.'s plan from reunification to adoption was in E.'s best interest.
Affirmed.
NOTES
[1] The proceeding before the juvenile court was a permanency hearing governed by ORS 419B.476(1). That statute provides, "[T]he court may receive testimony and reports as provided in ORS 419B.325."